## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 22 2017, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gary L. Griner
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Jurell Jones, | March 22, 2017 |
| *Appellant-Defendant*, | Court of Appeals Case No. 71A03-1604-CR-713 |
| v. | Appeal from the St. Joseph Superior Court |
| State of Indiana, | The Honorable Jane Woodward Miller, Judge |
| *Appellee-Plaintiff*. | Trial Court Cause No. 71D01-1507-MR-8 |

**Brown, Judge.**

[1]    Michael Jurell Jones appeals his conviction for murder, a felony. Jones raises

four issues, which we revise and restate as:

> I.    Whether the court abused its discretion when it admitted certain
>       testimony of a jail deputy;
>
> II.   Whether the evidence is sufficient to disprove Jones's claim of self-
>       defense;
>
> III.  Whether the prosecutor committed misconduct resulting in
>       fundamental error; and
>
> IV.   Whether the court erred when it barred Jones from presenting a visual
>       aid during closing argument.

We affirm.

### Facts and Procedural History

[2]    On July 10, 2015, Jones and his girlfriend Tamarra Townsend were out with his

friend Sarah Coleman, her boyfriend Eddy Hill, and other friends drinking at

Kelly's bar in South Bend, Indiana. Jones arrived at Kelly's bar at "about

between 4:30 and maybe 5:30" and started drinking. Transcript at 399.

Around 1:00 a.m. on July 11, 2015, they moved to Antonio's bar. Jones drove

separately and stopped at his house to shower and change clothes before

meeting the group at Antonio's. At Antonio's, Hill saw Coleman speaking

with another man, which made him angry, and Hill and Coleman argued. Hill

called Coleman names and yelled at her but did not threaten to hurt her and did

not become physical with her. Jones told them to calm down. After last call, as

the group walked out of the bar together, Hill called Coleman a "disrespectful

a-- b----." *Id*. at 344. While walking to his car, Jones said "Sarah, baby, I love

you, but you need to get rid of that . . . Hatin a-- n----." *Id*. at 335. Hill then walked towards Jones and yelled "That ho a-- n---- lucky I ain't got my strap. I'll shoot the s--- out of him." *Id*. at 337. Hill was unarmed that night. Coleman stood in front of Hill and stopped him and he calmed down and looked her in the eyes as Jones walked to his car. Jones opened his car door, "grabbed the gun from the door . . . and . . . started firing." *Id*. at 415. While Hill was still looking at Coleman, she heard a gunshot, and turned to see Jones holding a gun and not in "close range." *Id*. at 252. When Jones stopped shooting, he left.

[3]    Police arrived on the scene and found Hill lying on the ground in a pool of blood. They collected shell casings and bullet fragments from the crime scene, which collectively indicated that only one gun had been fired. The shells were all stamped "Hornady 40 Smith and Wesson." *Id*. at 221. Police recovered a box of Hornady ammunition from Jones's apartment that was consistent with the shell casings and bullet fragments from the scene. Police did not recover a weapon.

[4]    Hill died from multiple gunshot wounds, including one to the right side of his face, one to his left shoulder, one to his right lower abdomen, and one to each leg. No powder burns or stippling was found around any of the five wounds, indicating that the bullets were fired from a distance greater than a couple of feet. The trajectory of the fourth and fifth wounds were consistent with Hill being shot while lying on the ground. After fleeing the crime scene, Jones drove to Atlanta, Georgia and while driving threw the weapon used to shoot

Hill, a loaded .40 caliber semi-automatic pistol, out the window. Jones later returned to South Bend and turned himself in to the police.

[5] On July 13, 2015, the State charged Jones with murder, a felony. Jones raised the defense of self-defense. The court commenced a jury trial on January 11, 2016. During jury selection, the prosecutor questioned prospective jurors about their understanding of the presumption of innocence and stated:

> And when we're talking about the legal concepts that the judge brought into play the beyond a reasonable doubt burden of proof, as well as the presumption of innocence, it's said that the presumption of innocence is to be a safe guard for the innocent, but not a shield for the guilty . . . .

*Id*. at 70. Jones did not object.

[6] During the trial, Officer Alex Arendt of the St. Joseph County Metro Homicide Unit testified that he spoke with Jones during the investigation and that Jones had said "it was a bad situation that escalated to something stupid . . . ." *Id*. at 385.

[7] Prior to the State calling its first witness, booking officer Deputy Matt Sterling of the St. Joseph County Police Department, the court held a sidebar conference at which Jones objected to Deputy Sterling's testimony on the basis that, before speaking with him, Jones was not properly Mirandized and had "indicated that he didn't wish to speak any further until he had an attorney." *Id*. at 364. The court then took a break to research case law on statements made at booking. When the proceedings continued, the court read into the record a

passage from *Loving v. State*, 647 N.E.2d 1123 (Ind. 1995), and overruled Jones's objection, explaining, "these appear to be routine booking questions requesting information at the jail which would be responsible for someone's medical condition while in the jail would need to know." Transcript at 369. Deputy Sterling testified that during booking he asked Jones a series of administrative questions, including medical questions, from a checklist. Deputy Sterling asked "do you or have you suffered from seizures, blackouts, fainting spells or dizzy spells?" *Id*. at 373. Deputy Sterling stated that Jones answered in the affirmative, that he followed up by asking what triggers the blackouts, and that Jones answered, "from extreme anger, like the other night, and here I am." *Id*. at 374.

[8]     During direct examination, Jones's counsel asked Jones if he had had "situations where you've become overly angry and done something out of control," and Jones answered: "No. This was a first." *Id*. at 398. Jones also testified that when he asked Hill what was wrong, Hill would not reply, and that "it was like [Hill] blew if [sic] off . . . ." *Id*. at 408. When asked about the moments leading up to the shooting, Jones stated that after he opened his car door, Coleman grabbed Hill and said "no, don't . . . let's go," that Hill said, "I'll shoot that B n-----. And that was that." *Id*. at 411. Jones testified that he panicked, started firing, and did not know whether or not Hill had a gun. He also stated that he did not have a license to carry a handgun and that the gun was in his car because he had started shooting at a gun range.

[9] During closing, the prosecutor asked the jury to find that the evidence failed to support Jones's self-defense claim, stating:

> [C]ourts have found in Indiana that a mere verbal threat does not raise the concept of self-defense. The person has to do something to make your belief -- This all goes back to the reasonableness of the belief. To make your belief reasonable that you have to use deadly force. They've got to do something more than just say something. He said some words. I said some words. That was that. What else did the defendant say? . . . What else did he say? He said, I was walking to my car. He made a threat. That was it. Well, there you go.

*Id*. at 452. Jones did not object.

[10] Jones's counsel displayed a bar graph to the jury purporting to show various degrees of guilt and quantifying proof beyond a reasonable doubt. The State objected. The court sustained the State's objection, finding that the graph depicted proof beyond a reasonable doubt as measuring at "about 95 percent." *Id*. at 473. During rebuttal, and in response to other slides presented by Jones, the prosecutor stated:

> And I don't know if you noticed how the defense attorney worded in some of those slides. The standard is beyond a reasonable doubt. It doesn't get higher if you sneak in the word, all, there. Beyond all reasonable doubt. That doesn't change the standard. That doesn't change the law. The law is beyond a reasonable doubt . . . Beyond a reasonable doubt. That "A" is for a, not all.

*Id*. at 477. Jones did not object.

The court instructed the jury on the State's burden and Indiana law regarding proof beyond a reasonable doubt, the presumption of innocence, and self-defense. The jury found Jones guilty as charged and the court sentenced him to fifty-five years in the Department of Correction.

## *Discussion*

### I.

The first issue is whether the court abused its discretion when it admitted certain testimony of Deputy Sterling. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted).

Jones asserts that the trial court violated his *Miranda* rights and abused its discretion when it admitted Officer Sterling's question about what triggers his blackouts and his response that he blacks out "from extreme anger, like the other night, and here I am," into evidence. Transcript at 373. He claims that Deputy Sterling's question went beyond a routine booking question and constituted interrogation for the purposes of *Miranda*. Jones attempts to support his claims by pointing out that he was not processed differently after providing

his response and that Deputy Sterling informed detectives of his response. The State maintains that the question was a routine booking question and that, to the extent Jones's answer may have exceeded the question, his statement was voluntary.

[14] The Fifth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides: "No person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. A person who has been taken into custody or otherwise deprived of his freedom of action in any significant way must, before being subjected to interrogation by law enforcement officers, be advised of his rights to remain silent and to the presence of an attorney and be warned that any statement he makes may be used as evidence against him. *Loving*, 647 N.E.2d at 1125 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), *reh'g denied*). Statements elicited in violation of this rule are generally inadmissible in a criminal trial. *Id.* "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1690 (1980). Not every question asked by an officer amounts to interrogation. *Wissman v. State*, 540 N.E.2d 1209, 1212 (Ind. 1989). "Volunteered statements of any kind

are not barred by the Fifth Amendment . . . " *Innis*, 446 U.S. at 300 (quoting *Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630).

[15] The State has a "duty to take reasonable precautions to preserve the life, health, and safety" of inmates. *Reed v. State*, 479 N.E.2d 1248, 1254 (Ind. 1985). *See Sauders v. Steuben*, 693 N.E.2d 16, 18 (Ind. 1998); *Cole v. Ind. Dep't. of Corr.*, 616 N.E.2d 44, 45-46 (Ind. Ct. App. 1993), *reh'g denied, trans. denied*. "[R]outine administrative questions such as name, address, height, and weight, regardless whether considered within a 'routine booking exception' or whether deemed 'not testimonial,' are removed from the requirements of Miranda." *Loving*, 647 N.E.2d at 1126 (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601-602, 608, 110 S. Ct. 2638, 2650, 2654 (1990)).

[16] Deputy Sterling testified that he followed St. Joseph County Jail's practice for booking an inmate including asking medical questions to determine placement within the facility. He testified that medical questions are asked for safety reasons and that an inmate's medical status is used to determine where he is to be housed and whether he is assigned to a top or bottom bunk bed. The question of whether Jones "suffered from seizures, blackouts, fainting spells or dizzy spells" and the follow-up question asking for the cause of the medical condition were not designed to, nor were they reasonably likely to elicit, an incriminating response. Transcript at 373.

[17] Therefore, when Deputy Sterling asked Jones the medical questions, no *Miranda* violation occurred. *See Murrell v. State*, 747 N.E.2d 567, 574 (Ind. Ct.

App. 2001) (holding that the request for identifying marks was not designed to elicit an incriminating response, the question was routinely asked during booking procedures, and a police officer may ask such routine identification information without giving *Miranda* warnings), *reh'g denied*, *trans. denied*; *State v. Brown*, 697 S.E.2d 622, 627 (S.C. Ct. App. 2010) (holding that a question regarding current physical conditions was a routine booking question and affirming the trial court's admission of testimony regarding defendant's answer), *reh'g denied*, *cert. denied*; *State v. Moeller*, 211 P.3d 364, 367 (Or. Ct. App. 2009) ("A question about whether a detainee has a medical condition serves a standard administrative purpose, that is, to provide the police with the information necessary to attend to the detainee's medical needs while in police custody. Such a question is similar to the questions soliciting 'routine identifying information necessary for booking' that we have previously held are not subject to the requirement to give *Miranda* warnings."). Moreover, to the extent that Jones's response exceeded the scope of Deputy Sterling's follow-up question, his statement was voluntary. *See Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . .") Accordingly, the trial court did not abuse its discretion in admitting testimony of Jones's responses into evidence.

## II.

[18] The next issue is whether the evidence is sufficient to disprove Jones's claim of self-defense. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656

N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* The uncorroborated testimony of one witness can be sufficient to sustain a conviction. *Ferrell v. State*, 565 N.E.2d 1070, 1072-1073 (Ind. 1991).

[19] The offense of murder is governed by Ind. Code § 35-42-1-1, which provides, in part, that a person who knowingly or intentionally kills another human being commits murder, a felony. Self-defense is governed by Ind. Code § 35-41-3-2. A valid claim of self-defense is legal justification for an otherwise criminal act. *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002). In order to prevail on a self-defense claim, a defendant must demonstrate he was in a place he had a right to be; did not provoke, instigate, or participate willingly in the violence; and had a reasonable fear of death or great bodily harm. *Id.* The amount of force a person may use to protect himself depends on the urgency of the situation. *Harmon v. State*, 849 N.E.2d 726, 730-731 (Ind. Ct. App. 2006). However, "[w]hen a person uses more force than is reasonably necessary under the circumstances, the right of self-defense is extinguished." *Id.* at 731. Firing multiple shots undercuts a claim of self-defense. *Randolph v. State*, 755 N.E.2d 572, 576 (Ind. 2001); *Mayes v. State*, 744 N.E.2d 390, 395 n.2 (Ind. 2001). *See also Birdsong v. State*, 685 N.E.2d 42, 46 (Ind. 1997) (noting that deadly force was unreasonable where victims were shot several times after being incapacitated).

[20] When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *Wilson*, 770 N.E.2d at 800. If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Id.* at 800-801. The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Id.* at 801. We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.* A mutual combatant, whether or not the initial aggressor, must declare an armistice before he or she may claim self-defense. *Id*.

[21] Jones asserts that the State failed to disprove self-defense, that he reasonably believed he was in danger of great bodily harm, and that it was reasonable for him to react with deadly force when Hill began to approach him, threatened him, and yelled about shooting him. The State maintains that sufficient evidence was presented to rebut Jones's self-defense claim. The State also asserts that Jones's use of deadly force was disproportionate under the circumstances where he shot Hill five times after reaching his car, two of Hill's wounds were consistent with the shots being fired while Hill was laying on the ground, and Hill was unarmed.

[22] The record reveals that Jones and Hill exchanged words, that Hill was unarmed, that Hill had started walking towards Jones but had stopped, calmed

down, and his eyes were focused on Coleman. Jones walked away from Hill, reached his car, opened the door, grabbed the gun from the door, and started shooting. One bullet entered Hill's face, and at least two bullets were consistent with Hill having been shot after he had already fallen to the ground. Further, Jones indicated that he had become "overly angry" and that he did "something out of control." Transcript at 398.

[23] The jury heard the testimony, including the testimony of five law enforcement officers, a forensic pathologist, a crime laboratory firearm examiner, Coleman, Townsend, and Jones, and it was able to review the autopsy report and the photographic evidence of Hill's body, including the position of the bullet wounds. The jury was able to consider the extent to which the testimony of each witness was either consistent or inconsistent with the testimony of the other witnesses and the other evidence and was able to assess the demeanor and credibility of the witnesses and weigh their testimony. The jury also heard extensive testimony and arguments regarding the evidence related to Jones's claim of self-defense from both Jones and the State.

[24] Based upon the evidence, the jury could infer that Jones participated willingly in the violence, that he did not have a reasonable fear of death or great bodily harm, or that the amount of force he used was unreasonable under the circumstances. We conclude that the State presented sufficient evidence to negate beyond a reasonable doubt at least one of the elements of Jones's self-defense claim. *See Wallace v. State*, 725 N.E.2d 837, 840 (Ind. 2000) (affirming the defendant's convictions for murder and attempted murder, noting the

defendant claimed that he acted in self-defense and testified that one of the victims threatened him with harm if he did not pay money and the other victim reached for him and that at that point he produced a handgun and fired, observing that the trial court gave the jury a self-defense instruction and that the jury nonetheless convicted the defendant of murder, declining to reweigh the evidence, and holding that the State presented sufficient evidence to negate the defendant's claim of self-defense); *Milam v. State*, 719 N.E.2d 1208, 1210-1211 (Ind. 1999) (affirming the defendant's conviction for murder, observing that the defendant had stated that she shot the victim when he threatened to hit her, the victim was shot four times, and there was no evidence of a struggle, and holding a reasonable trier of fact could have found the defendant did not have a reasonable fear of death or great bodily harm and that the evidence was sufficient to rebut the defendant's claim of self-defense).

## III.

[25]     The next issue is whether the prosecutor committed misconduct resulting in fundamental error. In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Whether a prosecutor's statement constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. *Id.* The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather

than the degree of impropriety of the conduct. *Id.* When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. *Id.* If the party is not satisfied with the admonishment, then he should move for mistrial. *Id.* Failure to request an admonishment or to move for mistrial results in waiver. *Id.*

[26] We note that Jones did not object to the prosecutor's *voir dire* and made no objection during the prosecutor's closing arguments. Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. *Id.* More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. *Id.* Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Id.* It is an error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." *Id.* (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)).

[27] Jones argues that prosecutorial misconduct diminished his fundamental rights and deprived him of a fair trial. The State maintains that the prosecutor's statements were appropriate and that Jones was not denied a fair trial. Jones points to three statements. First, during *voir dire*, while discussing the presumption of innocence with prospective jurors, the prosecutor stated, "it's said that the presumption of innocence is to be a safe guard for the innocent, but not a shield for the guilty . . . ." Transcript at 70. Second, during the

State's closing argument, the prosecutor said, "courts have found in Indiana that a mere verbal threat does not raise the concept of self-defense." *Id.* at 452. Third, during the State's closing rebuttal argument, the prosecutor said:

> The standard is beyond a reasonable doubt. It doesn't get higher if you sneak in the word, all, there. Beyond all reasonable doubt. That doesn't change the standard. That doesn't change the law. The law is beyond a reasonable doubt. In shorthand, it's B.A.R.D. Beyond a reasonable doubt. That "A" is for a, not all.

*Id.* at 477.

[28] As to the prosecutor's statement, "courts have found in Indiana that a mere verbal threat does not raise the concept of self-defense," we find that there was no misconduct. *Id.* at 452. *See Smith v. State*, 506 N.E.2d 31, 34 (Ind. 1987) (holding that mere threats are not sufficient to justify the use of deadly force under a claim of self-defense and affirming the trial court's instruction stating "A defendant, who anticipates that the victim intends to kill him or cause him serious bodily injury, if and when the opportunity presents itself, is not justified in using deadly force against the victim until the victim performs some act indicating that the attack is imminent").

[29] With respect to the prosecutor's statement, "Beyond a reasonable doubt. That 'A' is for a, not all," we find that there was no misconduct. Transcript at 477. The court twice instructed the jury that a defendant's guilt must be proved "beyond a reasonable doubt . . . [but] [t]he state does not have to overcome every possible doubt." *Id.* at 180-181, 484-485. During closing, Jones's counsel stated, "the state has to convince you beyond *a* reasonable doubt that he did not

act in self-defense." *Id*. at 466 (emphasis added). We are unpersuaded by Jones's claim that the prosecutor's statements to the jury that the State did not have to prove the elements of murder beyond all reasonable doubt were improper.

[30]     As to the statement, "the presumption of innocence is to be a safe guard for the innocent, but not a shield for the guilty," we conclude that, to the extent the prosecutor's comments diluted the presumption of innocence, his statement was improper. *Id*. at 70. "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. The presumption of innocence is a basic component of a fair trial under our system of criminal justice." *Timmons v. State*, 500 N.E.2d 1212, 1214 (Ind. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S. Ct. 1861, 1870 (1979); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 1692 (1976), *reh'g denied*), *reh'g denied*. "[C]ourts must guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Timmons*, 500 N.E.2d at 1214.

[31]     However, Jones has failed to show that the prosecutor's statements created "an undeniable and substantial potential for harm." *Cooper*, 854 N.E.2d at 835. The court instructed the jury that the attorneys' opening and final statements were not evidence and twice instructed the jury on the presumption of innocence, the burden of proof beyond a reasonable doubt, and self-defense. Specifically, the court stated:

> [Y]ou must presume that the defendant is innocent and must
> continue to do so throughout the trial, unless the state proves

every essential element of the crime with which the defendant is charged beyond a reasonable doubt. . . . You should fit the evidence to the presumption that the defendant is innocent, if you can reasonably do so. . . . The burden is upon the state to prove beyond a reasonable doubt that the defendant is guilty of the crime charged. . . . The state does not have to overcome every possible doubt. The state must prove each element of the crime by evidence that firmly convinces each of you and leaves no reasonable doubt.

[32] Transcript at 180-181, 483-485. We presume that the jury followed the law contained within the trial court's instructions and applied the law to the evidence before it. *Fox v. State*, 997 N.E.2d 384, 390 (Ind. Ct. App. 2013), *trans. denied*. After reviewing the record, we conclude that the error here did not amount to fundamental error. *See Timmons*, 500 N.E.2d at 1214 (finding that prosecutor's comments characterizing the presumption of innocence as "merely procedural," amounted to misconduct but did not deprive defendant of a fair trial).

IV.

[33] The next issue is whether the court erred when it prevented Jones from presenting a visual aid during closing argument. Experiments and demonstrations may be permitted during the trial if they will aid the court and jury. *Peterson v. State*, 514 N.E.2d 265, 270 (Ind. 1987). "The conduct of experiments and demonstrations in the courtroom can however pose peril to the fairness of a trial." *Id*. In deciding whether to permit a demonstration, a court should consider such factors as the ability to make a faithful record of the drama for appeal purposes, the degree of accuracy in the recreation of the actual

prior conditions, the complexity and duration of the procedures, other available means for proving the same facts, and the risk that conducting such a procedure may pose to the fairness of the trial. *Id. See also Miller v. State*, 916 N.E.2d 193, 195-196 (Ind. Ct. App. 2009), *trans. denied*. A trial court's decision on the admissibility of a courtroom demonstration will be reversed only for an abuse of discretion. *Camm v. State*, 908 N.E.2d 215, 236 (Ind. 2009), *reh'g denied*.

[34] Jones asserts that the trial court abused its discretion by prohibiting him from using a demonstrative aid to explain the concept of proof beyond a reasonable doubt during his closing argument. The demonstrative aid was a slide purporting to measure various levels of doubt and beyond a reasonable doubt.[1] Jones claims that he was prevented from presenting a complete defense, in violation of the Due Process Clause of the Fourteenth Amendment, when he was not allowed to use the slide. Jones's counsel argued that the bar graph did not misstate the law. The State claims that the court properly sustained the objection, acted within its discretion in finding the slide misleading to the jury, and correctly instructed the jury on the State's burdens and reasonable doubt.

[35] In weighing the factors used to determine whether to permit a demonstrative aid, we note that the slide was not accurate because it used a bar graph to illustrate "guilty beyond a reasonable doubt." List of Witness and Exhibits at 77 (capitalization omitted). Proof beyond a reasonable doubt is "quantitatively

---

[1] The court described the slide for the record when it sustained the State's objection. A black and white copy appears on the final page of Jones's Exhibits but is not numbered or marked as an exhibit.

imprecise." *United States v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001) (citing *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 1076 (1970) (Harlan, J., concurring)). Furthermore, there were other means available and used for aiding the jury in understanding the burden of proof, including the jury instructions given by the court. Specifically, the court stated:

> The burden is upon the state to prove beyond a reasonable doubt that the defendant is guilty of the crime charged. It is a strict and heavy burden. The evidence must overcome any reasonable doubt concerning the defendant's guilt, but it does not mean that a defendant's guilt must be proved beyond all possible doubt. A reasonable doubt is a fair, actual and logical doubt based upon reason and common sense. A reasonable doubt may arise either from the evidence or from a lack of evidence. Reasonable doubt exists when you are not firmly convinced of the defendant's guilt, after you have weighed and considered all the evidence. A defendant must not be convicted on suspicion or speculation. It is not enough for the state to show that the defendant is probably guilty. On the other hand, there are very few things in this world that we know with absolute certainty. The state does not have to overcome every possible doubt. The state must prove each element of the crime by evidence that firmly convinces each of you and leaves no reasonable doubt. The proof must be so convincing that you can rely and act upon it in this matter of the highest importance. If you find there's a reasonable doubt that the defendant is guilty of the crime, you must give the defendant the benefit of that doubt and find the defendant not guilty of the crime under consideration.

Transcript 180-181, 484-485. Accordingly, the court did not abuse its discretion in excluding the demonstrative slide.

## *Conclusion*

[36] For the foregoing reasons, we affirm Jones's conviction for murder.

[37]    Affirmed.

Robb, J., and Mathias, J., concur.